# United States Court of Appeals
## For the First Circuit

No. 23-1091

YEMAL CALDERÓN-AMÉZQUITA, in his personal capacity and as the
sole heir of his late Father Carmelo Calderón-Marrero,

Plaintiff, Appellant,

v.

DR. VICTOR RIVERA-CRUZ; DOCTORS' CENTER HOSPITAL BAYAMON, INC.;
DR. ANDRÉS ÁVILA-GONZÁLEZ; DR. ANGEL TORRES-SÁNCHEZ; GRUPO DE
EMERGENCIAS VRC CSP; DR. CARLOS HERNÁNDEZ-ROMAN; SIMED; PUERTO
RICO MEDICAL DEFENSE INSURANCE COMPANY,

Defendants, Appellees,

DR. CHARLENE D'ACOSTA; DR. FLORA ORAMA;
DR. ROBERTO ZAYAS-PITYNSKA; DR. ALBERTO LEÓN-FILIBERTI;
DR. RAFAEL VICENS; ANA SUAREZ-NIEVES; JANE DOE; CONJUGAL
PARTNERSHIP AVILA-ROE; JANE DOE 01; CONJUGAL PARTNERSHIP
TORRES-DOE 01; CONJUGAL PARTNERSHIP LEON-DOE; CONJUGAL
PARTNERSHIP D'ACOSTA-DOE; CONJUGAL PARTNERSHIP HERNANDEZ-DOE;
CONJUGAL PARTNERSHIP ZAYAS-DOE; CONJUGAL PARTNERSHIP DOE-ORAMA;
CONJUGAL PARTNERSHIP VICENS-DOE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Thompson, Circuit Judges.

Paúl A. Rodríguez-Vélez, for appellant.

Benjamin Morales del Valle, with whom Morales-Morales Law Offices, was on brief, for appellees Dr. Victor Rivera-Cruz and Puerto Rico Medical Defense Insurance Company.

Benito I. Rodríguez-Massó and Jeannette López de Victoria for appellees Dr. Andrés Ávila González and SIMED.

Diego Rafael Corral-González, with whom Jorge J. López López, was on brief, for appellees Dr. Ángel Torres-Sánchez and Puerto Rico Medical Defense Insurance Company.

Doris Quiñones Tridas, for appellees Grupo de Emergencias VRC CSP and Puerto Rico Medical Defense Insurance Company.

Eugene F. Hestres Vélez, for appellees Dr. Carlo Hernández-Román and Puerto Rico Medical Defense Insurance Company.

———————————

October 30, 2025

———————————

**THOMPSON**, <u>**Circuit Judge**</u>.  In late January 2016, a 68-year-old man complaining of abdominal pain was brought by ambulance to Doctors' Center Hospital Emergency Room in Bayamón, Puerto Rico.  Less than a month later, he was dead.  That man's son and appellant, Yemal Calderón-Amézquita ("Calderón"), later filed suit against a slew of parties associated with Doctors' Hospital, alleging that their negligence and subpar medical treatment led to his father's untimely death.  But this litigation, rather than focusing on what happened (or should have happened) in that emergency room, got bogged down in a procedural quagmire. Thus, we are today tasked with deciding a couple more tangential questions about the adjudicatory rules that guide the federal and Commonwealth courts of Puerto Rico, and in particular, the rules related to when a claim must be brought and against whom.

These questions emerged during the disputatious motion practice below which culminated in a sweeping opinion and order by the district court entering summary judgment against Calderón in favor of five codefendants.  The district court called out Calderón for making a boatload of blunders -- most on the statute-of-limitations front and one related to the statutory exclusion of a claim against a party he sued.  Calderón now appeals and raises a litany of issues, each of which we'll track codefendant by codefendant.  Along the way we'll fill in the necessary details to provide a reasoned perspective on what

happened below. For reasons forthcoming, we see some things differently than the district court did and (spoiler alert) we will be vacating and remanding in part.

## BIG PICTURE

As alluded to in our opening, resolving the present appeal has little to do with the events that unfolded in Doctors' Hospital. But, for context and exposition on the current roster of appellate parties before us, we provide a brief overview on how we got here. In doing so, our (de novo) review of an order granting summary judgment "recite[s] the facts in the light most favorable to the nonmoving part[y]," here Calderón. Pippin v. Boulevard Motel Corp., 835 F.3d 180, 181 (1st Cir. 2016).

Carmelo Calderón-Marrero ("Marrero" or "Calderón's father" to avoid any confusion with Calderón) went to Doctors' Hospital Emergency Room in Bayamón, Puerto Rico around 10:00 p.m. on January 23, 2016, complaining of abdominal pain. After being evaluated by a hospital triage nurse, Marrero was seen by Dr. Andrés Ávila-González ("Dr. Ávila") -- the on-duty physician at Doctors' Hospital from 11:00 p.m. on January 23, 2016, to 7:00 a.m. on January 24, 2016. Dr. Ávila ordered an abdominal CT scan to be performed on his patient just after midnight; however, this scan did not occur until 4:04 p.m., sixteen hours after being ordered.

While Marrero waited for his scan, Dr. Carlo Hernández-Román ("Dr. Hernández") clocked in for an overlapping shift from 1:00 p.m. to 9:00 p.m. However, Dr. Hernández did not provide any treatment or assistance to Marrero. The next on-duty physician to treat Marrero -- Dr. Angel Torres-Sánchez ("Dr. Torres") -- worked from 3:00 p.m. to 11:00 p.m. on January 24, 2016, and reviewed the results of the delayed CT scan.[1] Following his review, Dr. Torres discussed Marrero's case with a surgeon. While all of this transpired, another physician, Dr. Víctor Rivera-Cruz ("Dr. Rivera"), played a role in this saga and he did so wearing two hats. First, he worked as the medical director of the emergency room and second, he was the sole owner and president of Grupo de Emergencias VRC CSP ("VRC") -- the corporation with exclusive rights over the administration and operation of Doctors' Hospital Emergency Room.

Post-CT scan (which revealed a perforated intestine), Marrero underwent surgery on January 25, 2016. Shortly after Marrero's surgery, Calderón, himself a licensed physician by trade who works and resides in Florida, arrived in Puerto Rico to see his father. During this visit, Calderón learned from several

---

[1] The missing link to our on-duty physician timeline is Dr. Carlos Alberto Léon-Filiberti, who worked the 7:00 a.m. to 3:00 p.m. shift on January 24, 2016. Although he was once part of this lawsuit, Calderón moved for voluntary dismissal of his claims against Dr. Léon-Filiberti in December 2018. The district court granted this motion soon after.

- 5 -

doctors and hospital staff the seriousness of his father's condition. In the end, Marrero went from the surgical table to the hospital's intensive care unit, where he remained until he died on February 21, 2016.

**THE LAWSUIT**

Calderón filed his original complaint with the federal district court in Puerto Rico over a year after his father's death on September 13, 2017, and an amended complaint on September 15, 2017 (after receiving a defective filing notice from the clerk's office). The amended complaint named Dr. Rivera, Dr. Ávila, Dr. Torres, and Doctors' Hospital as codefendants among several other parties.[2] Months later, on April 30, 2018, Calderón filed a second amended complaint adding Dr. Hernández and VRC to his suit.[3]

The second amended complaint presented four causes of action under Articles 1802 and 1803 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, §§ 5141-5142, alleging a myriad of medical malpractice claims tailored to the relevant codefendants and their connection to Calderón's father's care (further details

---

[2] These "other parties" included codefendants' spouses, conjugal legal partnerships, and fictitious names given to unknown insurance companies, doctors, and corporate entities who may have been liable for the death of Calderón's father.

[3] Calderón also added more doctors (who are no longer in the picture) and two insurance companies -- SIMED and Puerto Rico Medical Defense Insurance Company -- at this juncture. Calderón has not appealed any adverse judgment entered in favor of these insurance companies.

below as we unpack the relevant history for each appellee). After what the district court described as a "particularly contentious" discovery period, six codefendants rifled off a barrage of dispositive motions to the court. The result: summary judgment entered in favor of the five codefendants-now-appellees we've already introduced above.[4]

For Dr. Ávila, Dr. Torres, VRC, and Dr. Hernández, the district court determined that Calderón's claims were time-barred (though for slightly differing reasons). Separately, but to the same effect, the district court decided in part that Puerto Rico law did not provide a basis for liability against Dr. Rivera because he never provided direct medical treatment to Calderón's father.

## STATUTE OF LIMITATIONS PRIMER

We will first take up the claims related to the statute of limitations before addressing whether Puerto Rico's general tort statute covers the acts of Dr. Rivera. But before bombarding the gentle reader with more dates and times, we lay some foundation for the federal rules and Puerto Rico law we will be dealing with.

Because Calderón invokes our diversity jurisdiction, Puerto Rico law applies to his tort claims. See, e.g., Montalvo

---

[4] Only Doctors' Hospital's motion for summary judgment was denied in full by the court. Calderón's claims against the Hospital were later settled in the days preceding their scheduled trial date.

v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009). Specifically, we will be pulling the relevant substantive tort law, statute of limitations, and related tolling requirements for the statute of limitations from Puerto Rico's Civil Code and jurisprudence. See Alejandro-Ortiz v. PREPA, 756 F.3d 23, 27 (1st Cir. 2014) ("In Puerto Rico, the statute of limitations is a substantive and not a procedural matter." (quoting Olmo v. Young & Rubicam of P.R., Inc., 10 P.R. Offic. Trans. 965, 969 (1981))).

The tort statute of interest here has a one-year statute of limitations, or prescription period, that imposes a use-it-or-lose-it burden on potential plaintiffs "from the time the aggrieved person had knowledge" of the wrongdoing and who did it. Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc., 812 F.3d 213, 215 (1st Cir. 2016) (citation modified). While the statute of limitations is an affirmative defense that a defendant will typically have the burden of establishing, see id. at 216, in cases like this one where a plaintiff sues more than one year after their injury, the burden shifts to that plaintiff to demonstrate one of two things in order to overcome that statute of limitations bar: (1) that they "lacked the requisite knowledge at the relevant times," id. (citation modified); or (2) that they interrupted the prescription period, Tokyo Marine and Fire Ins. Co. v. Perez & Cia., de P.R., Inc., 142 F.3d 1, 4 (1st Cir. 1998). Stay with us while we offer a bit more insight into how a plaintiff can meet

either of the aforementioned burdens, as both are at issue in this appeal.

Starting with the first method we've identified, there are two types of requisite knowledge that can begin the one-year prescription period: actual knowledge and deemed knowledge. Hamdallah v. CPC Carolina PR, LLC, 91 F.4th 1, 22 (1st Cir. 2024). Actual knowledge is what it sounds like: "[i]t 'occurs when a plaintiff is aware of all the necessary facts and the existence of a likelihood of a legal cause of action.'" Id. (quoting Alejandro-Ortiz, 756 F.3d at 27). Deemed knowledge is a little more elusive: "[i]t is 'an objective inquiry where the plaintiff, while not having actual knowledge, is deemed to be on notice of her cause of action if she is aware of certain facts that, with the exercise of due diligence, should lead her to acquire actual knowledge of her cause of action.'" Id. (quoting Alejandro-Ortiz, 756 F.3d at 27).

As for the second method, interrupting (or "tolling") the prescription period, Puerto Rico statutory law provides three principal ways to do so: (a) by the institution of an action before the courts; (b) by extrajudicial claim of the creditor;[5] and (c) by

_____

[5] An extrajudicial claim notice is a formal letter sent directly to a party to inform them of a claim before filing a lawsuit. This pre-legal notice, sent from the holder of a substantive right, serves to outline an issue and demand a specific remedy to be sought in a subsequent lawsuit. Tokyo Marine, 142 F.3d at 4 (quoting Rodriguez Narvaez v. Nazario, 895 F.2d 38, 44

any act of acknowledgment of the debt by the debtor.  See Tokyo Marine, 142 F.3d at 4 (quoting P.R. Laws Ann. tit. 31, § 5303).  Moreover, cousin to these tolling methods is the doctrine of equitable tolling (a discrete method of interruption) which permits a court to excuse a late filing when certain "extraordinary circumstances" beyond the party's control cause them to miss the deadline.  In re Fin. Oversight and Mgmt. Bd. for P.R., 54 F.4th 42, 58 (1st Cir. 2022).  For example, under Puerto Rico's equitable tolling doctrine, a late filing may be excused where a defendant prevented or actively discouraged a plaintiff from investigating the details of the claim.  See Vistamar, Inc. v. Fagundo-Fagundo, 430 F.3d 66, 72 (1st Cir. 2005).

Due to differences among his gallimaufry of adversaries, Calderón presents prescription arguments on appeal tied both to his lack of requisite knowledge and to his various tolling efforts, which we'll explore and add layers to as we go along.  For now though, we are equipped with sufficient legal acumen to begin our review -- starting with Calderón's claims against a duo of doctor appellees, Dr. Ávila and Dr. Torres, and their statute of limitations defenses against these claims.

_____

(1st Cir. 1990)).  As relevant here, an extrajudicial claim notice can interrupt the prescription period for certain actions.  Id. at 4-5.

DISCUSSION

## I

To remind the reader, Dr. Ávila and Dr. Torres were two of the on-duty physicians who treated (or rather allegedly failed to treat) Calderón's father during his time at Doctors' Hospital. We review Dr. Ávila and Dr. Torres's claims together (as did the district court) because both doctors filed parallel motions to dismiss and remain in lockstep agreement with their arguments on appeal.

### (A)

Over two years after receiving Calderón's first amended complaint, Dr. Ávila and Dr. Torres each filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[6] In those motions, the doctors argued Calderón's claims against them were time-barred under Puerto Rico's one-year prescription period for tort claims. As they reasoned, the facts alleged in Calderón's

---

[6] An aside on this point: both codefendants had answered Calderón's complaint well before filing their motions. However, each doctor argued that the district court could nevertheless entertain their motions to dismiss, because of Federal Rule of Civil Procedure 12(c)'s allowance of such motions or because Puerto Rico's prescription period is a statutory based limitation, dooming an untimely initiation of suit. For our purposes, and because Calderón has not contested otherwise, we continue under the presumption that the motions to dismiss were properly before the district court. See, e.g., Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54-55 (1st Cir. 2006) (explaining the similar treatment of a motion to dismiss filed after a complaint has been answered).

complaint and Calderón's deposition testimony (which the doctors attached to their motions) demonstrated that Calderón had personal knowledge of his medical malpractice claim as early as January 2016 arising from his visit to his father immediately post-surgery and from his conversations with doctors at the hospital at that time. Both doctors emphasized Calderón's professional knowledge and training as an emergency room doctor to support their argument that Calderón's background allowed him to quickly recognize the severity of his father's condition and, thus, the possible shortcomings of the hospital's efforts. Calderón's personal knowledge of his claim, according to Dr. Ávila and Dr. Torres, triggered the prescription period -- which then lapsed sometime in late January 2017.

Although both doctors focused on the early accrual date premised on Calderón's personal knowledge, each motion to dismiss did mention in a passing sentence that neither doctor received an extrajudicial claim notice -- which Calderón alleged in his complaint to have sent -- before the clock had run out. But even if sent as Calderón claimed, the extrajudicial claim letters (according to the doctors' preferred timeline) would not have saved Calderón's case because he allegedly sent them on February 18, 2017 -- more than one year after Calderón's January 25, 2016 visit to his father's hospital bedside, where he spoke with doctors and

concluded his father had been mistreated, thereby acquiring personal knowledge of his medical malpractice claim.[7]

In opposition to the doctors' argument raised in the motions to dismiss, Calderón directed the district court to our caselaw tying the accrual date for a wrongful death action not to the knowledge of a surviving plaintiff, but to the time of death of the wrongly deceased. See Montalvo, 587 F.3d at 47-48. From there, Calderón rested on the facts of his complaint that his father died on February 21, 2016, and that he sent extrajudicial claim notices to both doctors on February 18, 2017 -- thereby tolling the statute of limitations three days before it expired.

Having received and considered these arguments and precedents, the district court rejected the doctors' proposed timeline and settled on the accrual date Calderón advocated for in his opposition to the motions to dismiss. In doing so, the district court stated that the proper accrual date arose at the time of Calderón's father's death on February 21, 2016, and not earlier when Calderón visited the hospital and became aware of the possibly negligent acts.

---

[7] As we touched on in our statute of limitations primer, sending an extrajudicial claim to a tortfeasor is one method for interrupting Puerto Rico's one-year prescription period. Tokyo Marine, 142 F.3d at 4 (citing P.R. Laws Ann. tit. 31, § 5303). Here, Calderón alleged in his complaint that he sent letters to the various named codefendants complaining of the tortious conduct and informing those codefendants of his intent to file suit.

However, the court's rebuff of the doctors' accrual-date argument regarding their statute of limitations defense did not end its analysis. Instead, the district court proceeded sua sponte (a term we'll be using often which is Latin for "of one's own accord" and legalese for actions taken by a court without prompting by a party) and without notice to the litigants to convert the doctors' motions to dismiss to motions for summary judgment. This unbeknownst conversion had the effect of placing a new burden on Calderón: He could no longer rest on the facts alleged in his complaint, but instead had to prove by the show of evidence that he had, in fact, properly tolled the statute of limitations to avoid the summary judgment scythe. This shift proved fatal to Calderón as the district court did not give him a chance to meet this heightened burden with evidence demonstrating that he had, in fact, timely sent his extrajudicial claims to both doctors. Instead, the court determined that Calderón's "conclusory allegations [as set forth in his pleadings], without proof" were insufficient to create an issue of material fact as to the doctors' "assertion[s] [contained in their motions] of not having received an extrajudicial claim" and, accordingly, entered summary judgment in the two doctors' favor.

### (B)

Calderón presents multiple arguments on appeal challenging the district court's decision to sua sponte convert

- 14 -

the doctors' motions, its subsequent resolution of the converted motions for summary judgment, and its denial of his motion for reconsideration. While Calderón finds errors abundant -- most relevantly with the conversion decision -- the doctors disagree. On appeal, Dr. Torres continues to assert that he never received any extrajudicial claim from Calderón, and that Calderón should have been aware that the district court would convert the motions to dismiss because discovery had taken place and the doctors attached deposition testimony to their motions. Dr. Ávila argues much the same: echoing that he never received an extrajudicial claim, stressing that conversion should have been anticipated because he attached and referenced matters outside the pleadings in his motion to dismiss, and pointing out that other codefendants had already filed summary judgment motions which were pending resolution when he filed his motion to dismiss.

Before any consideration of the merits of the district court's summary judgment decision, we must first address the threshold question of whether the conversion itself was appropriate.[8] We review this conversion ruling for abuse of

---

[8] The doctors likewise present multiple arguments urging us to affirm the district court's award of summary judgment based on the current record. The problem for those arguments is that, in this appeal, the "issue [of conversion] casts a large shadow over any attempt to review the ruling below." Ríos-Campbell v. U.S. Dep't of Com., 927 F.3d 21, 24 (1st Cir. 2019). Therefore, we see "[t]he dispositive question" relative to Calderón's claims against these two doctors as whether the district court abused its

- 15 -

discretion.  Ríos-Campbell v. U.S. Dep't of Com., 927 F.3d 21, 24 (1st Cir. 2019); Rubert-Torres v. Hosp. San Pablo, Inc., 205 F.3d 472, 475 (1st Cir. 2000).  And (heads up to the reader), because we conclude the district court discretionarily erred in its ruling, we decline to comment on the merits and remand to the district court for further consideration thereon.  We explain.

Federal Rule of Civil Procedure 12(d), entitled "Result of Presenting Matters Outside the Pleadings," informs our inquiry and states:

> If, on a motion under Rule 12(b)(6) . . ., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Based upon this rule, we have noted that the decision to convert a motion to dismiss to a motion for summary judgment is well within the purview of the district court's authority.  However, consistent with the rule's incorporation of procedural fairness, and mindful that "the summary judgment standard is considerably more stringent," Collier v. City of Chicopee, 158 F.3d 601, 603 (1st Cir. 1998), "we have disfavored conversion when . . . the nonmovant does not have reasonable notice that a conversion might occur," Rubert-Torres, 205 F.3d at 475; see also Boateng v.

discretion in conversion and "[o]ur consideration of the appeal begins -- and ends -- there."  Id. (emphasis added).

- 16 -

InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000) ("We have interpreted [Rule 12] as requiring some type of notice as a condition precedent to a court's conversion of a motion to dismiss into one for summary judgment."). And in addition to adequate notice of conversion is Rule 12's equally important dictate that district courts give all parties a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); see Collier, 158 F.3d at 603.

**(C)**

Distilled to its essence, our review of a district court's sua sponte conversion seeks to "guard against allowing such a conversion where it would come as a 'surprise' or be 'unfair' to the party against whom judgment is rendered." Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 31 (1st Cir. 2000) (quoting Chaparro-Febus v. Int'l Longshoremen Ass'n, Local 1575, 983 F.2d 325, 332 (1st Cir. 1992)). With that guiding principle in mind, and starting with our evaluation of the "surprise" component, it is evident based on the filings below that the district court's conversion of the duo doctors' motions to dismiss to those for summary judgment came as a surprise to Calderón.

Here is why. Both Dr. Ávila and Dr. Torres's motions came to the district court exclusively labeled as Rule 12(b)(6) motions, and each structured their arguments wholly along the

familiar contours of that rule. Cf. Chaparro-Febus, 983 F.2d at 332 (rejecting plaintiffs' claim of surprise in part because a motion titled "Motion to Dismiss" quoted Fed. R. Civ. P. 56 -- which is titled "Summary Judgment" -- extensively). And as we described above, the doctors put forth a non-frivolous, knowledge-based legal argument centered around the pleading's averments (when should Calderón be deemed to have known of his father's injury) which, had the court agreed on their proposed timeline, would have entitled them to Rule 12 relief. Calderón accepted the motions to dismiss as framed by the doctors and responded in kind -- crafting a rebuttal argument challenging the accrual date pushed by his adversaries. Given that both parties argued exclusively under the motion to dismiss rubric -- meaning that Calderón clearly rested on the well-pleaded facts of his complaint and the doctors' argument could have warranted relief after taking those facts as true -- we believe the court's sua sponte conversion without actual notice to Calderón can be fairly characterized as surprising. Cf. Clorox Co., 228 F.3d at 31-32.

That said, as we earlier noted, in addition to considering surprise we further gauge whether the sua sponte conversion was also unfair to Calderón as the party against whom judgment was rendered. The question thus becomes, notwithstanding Calderón's apparent surprise, did he have adequate notice that the court would likely treat the doctors' motions to dismiss as motions

for summary judgment and did he have a fair opportunity to respond? If the answer to both inquiries is yes, then Calderón should have seen it coming, and the conversion will not be considered unfair to him.  See Collier, 158 F.3d at 603.

Turning to the adequacy of the notice here, the doctors point out on appeal (and as we know from our caselaw) that "this circuit does not mechanistically enforce the requirement of express notice of a district court's intention to convert a Rule 12(b)(6) motion into a motion for summary judgment."  Boateng, 210 F.3d at 60 (citation modified) (quoting Chaparro-Febus, 983 F.2d at 332).  Pivoting off that observation, the doctors argue that in the absence of express notice, Calderón had two available sources of constructive notice that conversion was likely which they say doom his claims.

The first potential source of constructive notice, say the doctors, is that substantial discovery had been shared and the discovery period had closed by the time the doctors filed their motions to dismiss.  The district court cited these facts when adversely ruling against Calderón, and we don't disagree that the status of discovery is a consideration in our review.  See Rubert-Torres, 205 F.3d at 475 (disfavoring a conversion decision when "discovery [wa]s in its infancy" because, in that scenario, "[a] nonmovant is limited in obtaining and submitting evidence to counter the motion"); see also Ríos-Campbell, 927 F.3d at 24

(stating that once "substantial discovery has taken place, the plausibility standard" of Rule 12 "normally becomes a relic of a bygone time").  However, the option of filing a Rule 12 motion is not exhausted by the sharing of discovery, and a district court may entertain a Rule 12 motion even after substantial discovery has been shared.  See Am. Bd. of Internal Med. v. Salas Rushford, 114 F.4th 42, 52 (1st Cir. 2024) (recapping the district court's decision to adhere to the movant's request to treat her motion as a Rule 12 motion, even though substantial discovery had been shared); Otero v. Commonwealth of P.R. Indus. Comm'n, 441 F.3d 18, 20 (1st Cir. 2006) (reviewing an appeal from a Rule 12 motion "filed after there had been discovery"); see also Fed. R. Civ. P. 12(c) ("After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." (emphasis added)).

Because neither the Federal Rules of Civil Procedure nor our caselaw revokes a party's ability to file a Rule 12 motion once discovery has been shared, it necessarily follows that the sharing of discovery alone does not automatically provide adequate notice that a Rule 12 motion will be converted to one for summary judgment.  Though the logic of filing summary judgment motions after sharing discovery has purchase, see Grajales v. P.R. Ports Auth., 682 F.3d 40, 46 (1st Cir. 2012), nevertheless, notice of a possible sua sponte conversion depends on the specifics of the

motion to dismiss filed and what evidence beyond the pleadings that motion implicates, see Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83 (1st Cir. 1997) (describing "[t]he proper approach to conversion" as "functional rather than mechanical"); see also 5C Wright & Miller's Federal Practice & Procedure § 1366 (3d ed. 2008) ("The element that triggers the conversion is a challenge to the sufficiency of the pleader's claim supported by extra-pleading material that is not excluded by the court."  (emphasis added)).

So, turning back to how the events unfolded here, we believe the completed status of discovery was inadequate to provide Calderón with notice that the doctors' Rule 12 motions would be converted.  Recapping the chronology of the motion practice below, following the close of discovery, four codefendants (VRC, Dr. Hernández, Dr. Rivera, and Doctors' Hospital) moved for summary judgment.  In response to those motions, Calderón filed objections and rebutting arguments using our summary judgment standards, cited to on-point caselaw, attached supporting exhibits, and cited record evidence.  But unlike their compatriots, Dr. Ávila and Dr. Torres made different litigation decisions; they strategically opted to file Rule 12(b)(6) motions to dismiss challenging the sufficiency of Calderón's pleadings, presumably because they deemed it a more promising and expeditious route. Again, Calderón responded accordingly by filing an opposition that argued under motion to dismiss standards.  And since (as we've stressed) the

- 21 -

district court retained the option to render its decisions for these various motions on the grounds specifically requested by the litigants, despite the sharing of discovery, see, e.g., Salas Rushford, 114 F.4th at 52, we cannot conclude that Calderón was unreasonable in thinking the district court would do just that. Put differently, we cannot say that based on the facts of this case, the mere presence of discovery alone provided Calderón with adequate notice that the court, regardless of what the parties prayed for, would convert the motions.

Dr. Ávila and Dr. Torres offer a second justification in support of the district court's conversion decision; their motions to dismiss each attached a copy of Calderón's deposition testimony. But this argument cannot carry the day. Our caselaw states that if a nonmoving party (here, Calderón) attaches evidentiary materials to its opposition to a motion to dismiss -- thereby inviting the court to consider those materials -- that nonmovant is on notice of a possible conversion to summary judgment. See, e.g., Rubert-Torres, 205 F.3d at 475-76 ("Rubert-Torres had constructive notice because she presented the district court with additional materials in her opposition memorandum."). But the problem here is this: contrary to the district court's description of how the motions and objections got filed, Calderón did not attach any materials to his opposition to the motions to dismiss and he argued exclusively on the pleadings.

True, the attachment of evidentiary materials to a motion to dismiss by a moving party may provide some notice to a nonmoving party that conversion might reasonably occur. See, e.g., Collier, 158 F.3d at 603 (explaining that constructive notice may be found where a "movant attaches to his motion, and relies on, materials dehors the pleadings"). But (to reiterate) "[t]he proper approach to conversion under [Rule 12] is functional rather than mechanical," Fullerton Tires, 115 F.3d at 83, and in assessing whether constructive notice was adequate, we've observed that "not every attachment to a [Rule 12] motion or opposition thereto requires conversion into a motion for summary judgment," Rubert-Torres, 205 F.3d at 476; see also Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18 (1st Cir. 1992) ("A motion to dismiss is not automatically transformed into a motion for summary judgment simply because matters outside the pleadings are filed with, and not expressly rejected by, the district court.").

Here, the problem in allowing conversion based on the evidentiary documents Dr. Ávila and Dr. Torres attached to their dismissal motions is that they served as a Trojan Horse. As we explained earlier, the testimonial transcripts were submitted for a particular purpose -- to demonstrate Calderón's personal knowledge of his claim premised on his medical background, a factor only relevant to the doctors' legal argument that focused on an

early start date for the statute of limitations period. Yet the documents wound up opening the gates for the district court to decide a separate prescription issue -- one that no one had briefed or supplied evidence of, and which neither doctor asserted as a basis for relief: whether Calderón sent extrajudicial claim notices to the doctors to toll the limitations period. See Fullerton Tires, 115 F.3d at 84 ("Of course, a motion cannot be converted to one of summary judgment unless the adverse party is given 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" (quoting Fed. R. Civ. P. 12)).

Under these circumstances, we believe that absent notice of conversion to Calderón, he was not made aware that he needed to come forward with evidence that he sent extrajudicial claim notices. That's because the arguments the doctors advanced and the evidentiary attachments they emphasized did not adequately call into question the existence of the extrajudicial notices. Only the district court's sua sponte conversion brought the extrajudicial claims to center stage.[9] And as with other "species of sua sponte summary judgment," the "targeted party" should be

---

[9] Tellingly, the district court never mentioned the contents of the attached materials in its order and opinion, and at oral argument, the doctors could not explain how the attached materials that focused on Calderón's deemed knowledge of his father's injury would have provided Calderón with notice of the ultimate grounds upon which the district court rendered its decision.

afforded "notice that an issue is in play." Oahn Nguyen Chung v. StudentCity.com, Inc., 854 F.3d 97, 103 (1st Cir. 2017) (quoting Berkovitz v. Home Box Off., Inc., 89 F.3d, 24, 28(1st Cir. 1996)); cf. Rogan v. Menino, 175 F.3d 75, 79, 80-81 (1st Cir. 1999) (stating that the target of sua sponte summary judgment "is entitled to know both the grounds that the district court will consider and the point at which her obligation to bring forth evidence supporting the elements of her claim accrues" and vacating judgment where "the summary judgment loser was never afforded such an opportunity").[10]  Without notice, Calderón was deprived of an opportunity to present the material made pertinent by the conversion to summary judgment.  See Rubert-Torres, 205 F.3d at 475 ("Conversion of a motion for judgment on the pleadings into one for summary judgment should only occur after the parties have been offered a reasonable opportunity to present pertinent summary judgment materials." (citation modified)).

---

[10] Briefly departing from his comrade, Dr. Ávila argues on appeal that because other codefendants filed motions for summary judgment, Calderón should have known the court would convert his motion to dismiss.  Dr. Ávila does not provide any citation to our caselaw for this proposition that Calderón should have anticipated the district court's conversion because he received unrelated motions for summary judgment.  See, e.g., Oquendo v. Costco Wholesale Corp., 857 Fed. Appx. 9, 12 n.3 (1st Cir. 2021) ("We require argument with legal authority and record citation."). Furthermore, as expressed above, we see this scenario cutting the other way and reject Dr. Ávila's stand-alone theory of constructive notice.

Moreover, we have no doubt this deprivation was prejudicial to Calderón because he promptly brought the newly critical piece of evidence to the court's attention one day after the ruling via a motion to reconsider. See Moody v. Town of Weymouth, 805 F.2d 30, 31-32 (1st Cir. 1986) (finding no prejudice following a conversion to summary judgment where plaintiff failed to show he would have done something differently and likely defeated defendants' motions). Nevertheless, after seeing proof of the extrajudicial claim notices sent to Dr. Ávila and Dr. Torres, the court stuck to its guns and denied Calderón's motion to reconsider. In doing so, the court remarked that it refused to give Calderón what it felt was "yet another bite at the apple." We cannot agree. The more apt analogy is that the district court did not provide Calderón a chance to take the first bite.

We need go no further. In determining the court abused its discretion by sua sponte converting the motions to dismiss to motions for summary judgment without adequate notice given to Calderón, we need not consider the parties' arguments related to how the district court handled the motions post-conversion, nor those related to Calderón's motion for reconsideration. As such, the judgment of the district court is vacated and remanded for further proceedings. See Ríos-Campbell, 927 F.3d at 26.

**II**

We next move on to Calderón's appeal of the grant of summary judgment for VRC. Here's how this dispute came about. VRC was the corporate entity with exclusive rights to oversee the administration and operation of Doctors' Hospital Emergency Room while Calderón's father was there. Unlike the two appellees previously discussed (Dr. Ávila and Dr. Torres), VRC was not formally added to this lawsuit until Calderón filed his second amended complaint on April 30, 2018 -- which alleged that VRC was jointly and severally liable for Marrero's death due to its own shortcomings as a corporate entity and vicariously liable for the shortcomings of the physicians it employed. By this point, well over a year had passed since Calderón's father passed away, and VRC moved for summary judgment on the basis that Calderón's claims were time-barred.

**(A)**

VRC's motion for summary judgment set out in general terms the burden Calderón needed to prove to have successfully interrupted the prescription period for his claims. Calderón filed an opposition wherein he: (1) admitted VRC's proffered facts; (2) gave an additional statement of facts; and (3) asserted a knowledge-based defense arguing the statute of limitations for his claim against VRC didn't start to run until April 25, 2018 when he "first learned about the existence of VRC" via a parallel

- 27 -

Commonwealth court proceeding. Separately (but in the same motion), he argued that the doctrine of equitable tolling restarted the clock for his claims against VRC on February 13, 2017, because from that point on, multiple codefendants actively hid VRC's identity from him, putting discovery of that identity beyond his control. In support of his opposition, Calderón attached an unsworn declaration under penalty of perjury[11] and a copy of an extrajudicial claim letter addressed to several parties including Dr. Rivera and Doctors' Hospital, but not one specifically for VRC. Important for our pending discussion, Calderón's declaration included a statement that he first learned of VRC's existence on April 25, 2018, through answers to an interrogatory filed by Doctors' Hospital in parallel state court litigation.[12]

Responding to Calderón's opposition, VRC filed a reply wherein it expanded on its initial arguments and addressed

---

[11] We will refer to this document as "Calderón's declaration" and note that "[u]nder federal law, an unsworn statement signed under penalty of perjury may be used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment." Rodríguez-Severino v. UTC Aerospace Sys., 52 F.4th 448, 458 (1st Cir. 2022) (alteration in original) (quoting Goldman, Antonetti, Ferreiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686, 689 (1st Cir. 1993)).

[12] A brief aside on this parallel state lawsuit as it will come up from time to time in our discussion. On August 14, 2017, Calderón's brother and sister filed a similar damages claim in the Commonwealth Bayamón Court of First Instance. That lawsuit includes many familiar faces as its federal counterpart, including Doctors' Hospital, Dr. Ávila, Dr. Torres, and VRC.

arguments newly raised by Calderón. VRC did not dispute Calderón's additional statement of facts but argued his claims nevertheless remained time-barred because: (1) Calderón's extrajudicial claim notice, although addressed to Dr. Rivera personally and as medical director, was not addressed to VRC, a separate entity; (2) the extrajudicial claim did not comply with the minimum requirements for interrupting the prescription period; and (3) the claim against VRC was filed after the one-year statute of limitations had passed due to Calderón's own lack of due diligence. Calderón then filed a surreply wherein he incorporated his arguments related to his extrajudicial claims from a separate filing against Dr. Rivera and walked through the steps he took to find the identity of VRC, which he again claimed were stonewalled by various codefendants.

After collecting this series of back-and-forth filings, the district court granted VRC's motion for summary judgment, but not before preliminarily deciding, sua sponte, to disregard Calderón's declaration (where he stated that he first learned about VRC on April 25, 2018).

The district court gave three reasons why it disregarded Calderón's declaration. First, it determined that Calderón lacked the requisite personal knowledge as to the specific information offered in his declaration. The district court reasoned that because neither Calderón nor VRC were parties to the parallel state

court proceedings (the alleged source of Calderón's actual knowledge of VRC's existence), Calderón "could have *only* been informed about [VRC's] existence through his siblings or attorney." To the district court, "[t]his inference alone defeat[ed] the 'touchstone' analysis necessary to prove personal knowledge because [Calderón] would lack personal knowledge as to this specific information" of VRC's involvement in the treatment of his father. See Pérez v. Volvo Car Corp., 247 F.3d 303, 315 (1st Cir. 2001).

Second, calling it a "procedural deficiency" that could not defeat VRC's summary judgment motion, the district court faulted Calderón's declaration for referencing and relying on a document (Doctors' Hospital's interrogatory response from the state court case) without attaching it or otherwise placing it in the record.

The district court's third and final justification for disregarding the declaration concerned the declaration's "authenticity and validity." In expounding upon its decision, the district court observed that in an earlier deposition, Calderón stated that he learned about the existence of VRC "when this whole process began" -- an assertion that the district court found contradictory of his statement that he learned about VRC later on during this legal process. According to the district court, this discrepancy -- along with the timing of Calderón's statement after

discovery had closed and after VRC filed its motion for summary judgment -- justified the court's decision to disregard the declaration.

After nixing Calderón's declaration containing the critical statement about when he purportedly acquired actual knowledge of VRC's existence, the district court found no evidentiary support for Calderón's equitable tolling argument and, accordingly, rejected it. Thereafter, the district court entered summary judgment in favor of the corporation.

**(B)**

On appeal, Calderón brings a laundry list of challenges to the district court's grant of summary judgment, contesting the court's evidentiary ruling and accusing the court of basing its decision on legal arguments VRC never raised and on facts VRC never disputed. In this light, Calderón sees the court's sua sponte disregard of his declaration as violating the party presentation principle and his due process rights. See generally United States v. Sineneng-Smith, 590 U.S. 371, 375-76 (2020) (outlining the party presentation principle). In addition to seeking reversal of the summary judgment ruling, Calderón asks that we reinstate his vicarious liability claims against VRC. In retort, VRC says the district court's three-pronged rationale is beyond reproach and asks that we affirm the summary judgment ruling because Calderón's claims remains time-barred.

Although our review of a grant of summary judgment is de novo, e.g., Hamdallah, 91 F.4th at 16, "we often first consider challenges to the district court's evidentiary rulings, as such rulings define the record on which the summary judgment rests." Bonner v. Triple-S Mgmt. Corp., 68 F.4th 677, 687 (1st Cir. 2023) (quoting Livick v. Gillette Co., 524 F.3d 24, 28 (1st Cir. 2008)). We will do that here, and we review these evidentiary rulings for abuse of discretion. See id. at 687-88. "Under that standard, we will not disturb the district court's ruling unless the record demonstrates an error of law or serious lapse of judgment on the part of the court." Id. at 687 (quoting Livick, 524 F.3d at 28).

Calderón argues the district court abused its discretion in disregarding his declaration for a host of reasons best sorted into two buckets: first, the court lacked authority to disregard evidence on its own volition and second, its justifications for rejecting the evidence misapplied relevant law.

### (C)

In the first of Calderón's two contestations, he takes issue with the district court's decision to jettison his declaration because VRC did not object to it below and, in fact, expressly conceded to having no dispute with his factual proffer.[13]

---

[13] VRC might have made this decision because its motion for summary judgment was based on a theory of due diligence which would have negated Calderón's "cognitive theory" (we'll talk more about this shortly) based on when he gained actual knowledge of VRC's

- 32 -

Calderón goes on to complain that, despite VRC's failure to mount a challenge to Calderón's declaration, the district court nonetheless opted to disregard it and, in particular, the crucial statement within the declaration where Calderón claimed he learned about VRC in April 2018.[14]  However, Calderón's arguments fall short in convincing us the court abused its discretion in disallowing the declaration.

District courts typically have broad discretion regarding evidentiary rulings, and this applies with equal force when shaping the scope of the summary judgment inquiry.  See Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 31-32 (1st Cir. 2004) ("[A] trial court should have as much leeway in dealing with [evidentiary] matters at the summary judgment stage as at trial.").  While we have not expressly weighed in on whether a

---

existence.  See, e.g., Hamdallah, 91 F.4th at 23 ("Putting everything together, this all means that the one-year statute of limitations begins to run 'when the injured party knew or should have known of the injury and of the likely identity of the tortfeasor.'" (quoting Tokyo Marine, 142 F.3d at 3)).

[14] The district court relied on a sentence in VRC's reply which it felt "puts into question" Calderón's personal knowledge of the information in his declaration.  That sentence read:  "The interrogatories that plaintiff refers to as to providing the information concerning [VRC], were part of the discovery conducted in a state court case, in which neither [Calderón] nor [VRC] are parties."  Because we deem this statement a far cry from any developed argumentation asking that the court disregard Calderón's evidence, we proceed under the assumption that the district court made its evidentiary determination sua sponte (which, spoiler alert, does not alter the outcome).

district court may disregard an unobjected-to declaration sua sponte, we have held under similar circumstances that it was well within a district court's discretion to disregard evidence that was clearly defective on its face. See Doucette v. Jacobs, 106 F.4th 156, 171 (1st Cir. 2024) (upholding the district court's discretionary gatekeeping role when it sua sponte struck an expert's report with defects "obvious on its face" (citation modified) (quoting Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 188 (1st Cir. 1997))); see also Maiorana v. MacDonald, 596 F.2d 1072, 1079 n.9 (1st Cir. 1979) (noting that "the district court itself noted the defects and disregarded the counteraffidavits" where a party did not move to strike).

Pushing back on this view of the court's discretionary authority, Calderón points to a case that he says stands for the proposition that courts may not, sua sponte, disregard unchallenged declarations. However, we think Calderón's understanding of the court's ruling is a stretch. In that case, Davis v. Sears, Roebuck and Co., 708 F.2d 862, 864 (1st Cir. 1983), this court considered whether a nonmoving party waived her challenge to an undisputably inadmissible affidavit submitted by a moving party in a dispositive motion. Since the nonmovant failed to move to strike and object to the infirm affidavit, we determined the affidavit "may properly be considered by the court when ruling on the motion." Id. Calderón frames this as the "applicable rule

of decision" and, extrapolating from Davis, argues the district court's spontaneous disregard of an unobjected-to declaration constitutes reversible error.  However, just because it was not error for the Davis court to consider an unobjected-to affidavit does not mean it is error here for the district court to disregard an unobjected-to affidavit.  Calderón's suggested reading of our precedent overlooks our bottom line holding: that the court's decision to consider the unobjected-to, flawed affidavit was within the inherent discretionary authority of the district court. Id. ("[I]ts consideration by the district court was discretionary.").

For reasons we are about to explain, the court here did not abuse its discretion due to the clear defects apparent on the face of Calderón's declaration.  See Doucette, 106 F.4th at 171; cf. Werner v. Young, No. 22-5197, 2023 WL 639103, at *9 (6th Cir. Jan. 27, 2023) (finding a district court did not abuse its discretion by sua sponte striking sections of an affidavit). Because, standing alone, it is not reversible error for the district court to disregard the declaration on its own volition as Calderón contends, we continue to Calderón's second line of argumentation: whether the district court, in discretionarily disregarding the declaration, misapplied relevant law in justifying its decision to do so.

As we outlined above, the district court gave three justifications for its decision to toss Calderón's declaration, any of which (if correct) would be sufficient to conclude no abuse of discretion.  Because we conclude the district court's third rationale is satisfactory, we bypass commenting on reasons one (Calderón's lack of personal knowledge) and two (a procedural deficiency due to Calderón's failure to attach the hospital's interrogatory answers), and zero in on the propriety of justification three -- the contradictions between Calderón's earlier deposition testimony and the declaration.[15]  And here's why that reasoning holds up.

Our case law establishes that "where a party has given clear answers to unambiguous questions in discovery, that party cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory unless there is a satisfactory explanation of why the testimony has changed." Escribano-Reyes v. Pro. Hepa Certificate Corp., 817 F.3d 380, 386 (1st Cir. 2016) (citation modified).  As the district court pointed out, Calderón's declaration contradicted his earlier deposition testimony related to when he first learned about VRC.  That testimony went like this:

_____

[15] That said, the other two reasons cited by the court for disregarding Calderón's declaration must necessarily be discussed momentarily, when addressing Calderón's appeal against Dr. Hernández.  See infra part III.

- 36 -

Q: You've already stated that you had a conversation with Dr. Víctor Rivera when you came to Puerto Rico and your father was still at the Doctors Center Hospital.

A: Yes.

Q: On that occasion did you ask Dr. Rivera which was the company in charge of administering, administrating and operating the ER at Doctors Center Hospital?

A: No, I simply asked him for the director, I didn't, I didn't ask any other questions.

Q: And when you spoke to Dr. Martorell which you said was the director of the hospital did you ask Dr. Martorell which was the corporate entity that was in charge of that, administering the ER?

A: No.

Q: When did you become aware that Grupo de Emergencias VRC was the corporate entity that was in charge of administering and of the administration and operation of the hospital's ER?

A: When this process began.

Q: Which process are your [sic] referring to?

A: This whole process, this whole legal process against the hospital and the doctors involved.

Q: So from that I can understand that you didn't ask anyone at the hospital when you visited Doctors Center Hospital regarding or looking for information as to the corporation that was in charge of the ER.

A: The only thing I knew was that Víctor Rivera Cruz was the owner of the group.

Q: And when did you become aware of that?

A: When this whole process began.

Q: This whole process referring as to the complaint?

A: Yes.

Considering this testimony alongside Calderón's declaration, see Fed. R. Civ. P. 56(c)(3) ("The court . . . may consider other materials in the record."), the district court found Calderón's previous answer as to when he first learned about VRC's existence inconsistent with his later declaration that he learned about VRC on April 25, 2018. In finer detail, the district court read Calderón's deposition testimony to mean that he learned about VRC's involvement at "the time of filing the initial complaint" in September 2017. While Calderón takes issue on appeal with the district court's interpretation of his deposition testimony, it seems to us to be the most favorable reading to Calderón (a privilege bestowed on the nonmovant at summary judgment) considering "this whole legal process against the hospital and doctors involved" could reasonably be interpreted as beginning several months earlier in February 2017, when he mailed several extrajudicial claim letters to Doctors' Hospital.

In any reading, Calderón's testimony to an unambiguous question (Q: "When did you become aware . . ." A: "When this process began.") contradicts his declaration that he only learned

about VRC on April 25, 2018, roughly seven months after his lawsuit against Doctors' Hospital and the doctors was initiated. See Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 30 (1st Cir. 2019) ("Nothing . . . in First Circuit law permits a plaintiff to do a volte-face from her deposition admissions.").

In properly taking notice of record evidence and applying settled circuit precedent, the district court did not abuse its discretion by disregarding Calderón's declaration that contradicted his earlier testimony. Consequently, as Calderón's alternative arguments rest entirely on an antithetical perspective of this issue, we reject Calderón's claims that the district court violated the party presentation principle and his due process rights.

**(D)**

With our resolution of Calderón's evidentiary challenge, we must now consider de novo whether the district court properly awarded summary judgment to VRC on the ground that Calderón's claims were time-barred. Even without the declaration in the mix, Calderón contends he should have prevailed against VRC's summary judgment motion, and he offers three arguments for why he thinks the district court reversibly erred in finding his cause of action against VRC time-barred.

Our de novo review simply means we are going to give the decision "a completely fresh look." Hamdallah v. CPC Carolina PR,

LLC, 91 F.4th 1, 16 (1st Cir. 2024).  In doing so, we ask whether VRC as the moving party is "entitled to judgment as a matter of law because there is no genuine dispute as to any material fact -- even after taking all facts and inferences in the light most flattering to" Calderón.  Id. (quoting Delgado-Caraballo v. Hosp. Pavía Hato Rey, Inc., 889 F.3d 30, 34 (1st Cir. 2018)).  We add that while VRC has the initial burden as the moving party, Calderón must present "specific facts showing that a trier of fact could reasonably find in [his] favor."  Id. at 17 (quoting Johnson v. Johnson, 23 F.4th 136, 141 (1st Cir. 2022)).

Before we delve into our de novo review of the first of Calderón's three arguments, we note that Calderón does not dispute the applicability of the one-year statute of limitations to his claims against VRC.  And as we discussed above in our statute of limitations primer, more than one year had elapsed between the death of Calderón's father and the filing of the original complaint.[16]  Under these circumstances, Calderón faces the burden

---

[16] In assembling the statute of limitations timeline for Calderón's claims against VRC, the district court correctly determined that Calderón's substitution of VRC for the fictitious "Corporation Z" in his second amended complaint meant that his claims related back to the filing date of his original complaint.  See Alejandro-Ortiz, 756 F.3d at 27 (applying the substantive statute of limitations law of Puerto Rico in a diversity case); Nohemi Melendez v. Hosp. Hermanos Melendez, Inc., 608 F. Supp. 2d 196, 201 (D.P.R. 2008) (explaining the relation back principle under Puerto Rico civil procedure).  VRC has not disputed this holding, nor does it impact our review.

of proving that he either lacked the requisite knowledge to start the statute of limitations clock, see Rivera-Carrasquillo, 812 F.3d at 215, or he effectively paused that clock before it ran out, see Rodriguez v. Suzuki Motor Corp., 570 F.3d 402, 406 (1st Cir. 2009).

**(1)**

Up first is Calderón's argument invoking the doctrine of equitable tolling. Calderón says this doctrine supports his claim that summary judgment in favor of VRC was inappropriately granted. A few more words about equitable tolling will be helpful to our discussion.

In broad strokes, the equitable tolling doctrine has footing in both federal and state law. See Ramirez Morales v. Rosa Viera, 815 F.2d 2, 4 (1st Cir. 1987). And, generally speaking, it allows a court to "excuse a party's failure to take action in a timely manner, where such failure was caused by circumstances that are out of his hands." Dawoud v. Holder, 561 F.3d 31, 36 (1st Cir. 2009). Crucially, this doctrine "is sparsely applied, and it cannot be used to rescue a plaintiff from his or her lack of diligence." Cao v. Puerto Rico, 525 F.3d 112, 115 (1st Cir. 2008); see also Chico-Velez v. Roche Prods., Inc., 139 F.3d 56, 59 (1st Cir. 1998) (stating that "equitable tolling is reserved for exceptional cases").

In his briefing, Calderón offers us a one-paragraph-appellate accusation on the equitable tolling front. It boils down to his assertion that he sent Doctors' Hospital and Dr. Rivera extrajudicial claim letters requesting information on all the legal entities in charge of the healthcare professionals who provided medical services to his father and got no response from either party.[17] He positions this factual assertion -- "those who knew the identity of VRC Group purposely kept it hidden from [him]" -- as the reason he was unable to meet the one-year filing bar.[18]

In perusing the record, admittedly, what we find is that VRC and the district court didn't have much to say about this issue. But that said, we once again remind the reader that we are engaging in a de novo review of the record, and it is Calderón's burden to demonstrate he interrupted the prescription period. And in that vein, what we see in our scrutiny of his briefing is a lackadaisical treatment of this tolling argument that does not

---

[17] Calderón attached to his opposition to VRC's motion a copy of the extrajudicial claim notice sent to Dr. Rivera (in his capacity as the "Emergency Room Director") to support his equitable tolling argument. Calderón has not argued on appeal or to the district court that this extrajudicial claim notice interrupted the prescription period for his claim against VRC.

[18] VRC did not advance any argument against the application of the equitable tolling doctrine in its reply to Calderón's opposition to summary judgment, and similarly offers no arguments on appeal.

inure to his benefit. For starters, we necessarily observe that Calderón's appellate brief does not acknowledge the existence of the separate federal and Puerto Rico equitable tolling doctrines. Although the two cases he cites in support of his claim speak of both (albeit to deny relief under either approach), see Díaz v. Rivera, 217 F. Supp. 3d 464, 469 (D.P.R. 2016); Ramirez Morales, 815 F.2d at 4, his brief does not distinguish which doctrine he advocates for relief under. And even assuming that Puerto Rico's equitable tolling doctrine is the right measuring stick, Calderón does not mention the requirements of that doctrine nor how they map onto the specific facts of his case. See Benitez-Pons v. Puerto Rico, 136 F.3d 54, 61 (1st Cir. 1998) (explaining that equitable tolling under Puerto Rico law is available when "damage [is] willfully and wrongfully . . . concealed by the author of the same" (quoting Ramirez Morales, 815 F.2d at 4)). His failure to do so, particularly when requesting the application of a doctrine reserved for extraordinary circumstances, results in his waiver of this claim. See Rodriguez v. Mun. of San Juan, 659 F.3d 168, 175-76 (1st Cir. 2011).[19]

---

[19] Even if we did not find Calderón's equitable tolling claim waived, there's another problem. Calderón's claim is that he didn't receive VRC's name from Doctors' Hospital or Dr. Rivera following his letter sent almost a year after his father's death. Without any explanation of what he did in the interim to discover this information, we don't see it as presenting such "extraordinary circumstances" warranting the application of this narrow exception to the general rule. See, e.g., Chico-Velez, 139 F.3d at 58

- 43 -

**(2)**

Next, in furtherance of his summary judgment protestation, Calderón argues the district court, in ruling in VRC's favor, "ignored uncontested deposition testimony" which unequivocally demonstrated that he learned about VRC "at some point after [Calderón] filed his Complaint in September 2017." We've already provided this "uncontested deposition testimony" above as it is the same testimony that led the district court to disregard Calderón's declaration where he stated, contradictorily, that he learned of VRC's identity on April 25, 2018.

To remind, Calderón's opposition to VRC's motion for summary judgment was premised almost entirely on an "actual knowledge" theory which, if accepted per his declaration, would have started the prescription period for his claims against VRC on April 25, 2018 -- the date he alleges to have first gained actual knowledge of VRC's existence. In its consideration of VRC's motion, the district court examined the available record evidence to determine whether it showed "that there [was] no genuine dispute as to any material fact and the movant [was] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In doing so and as we've already discussed, the court came across an inconsistency between Calderón's factual assertions about when he acquired

_____

(explaining that "equitable tolling is reserved for exceptional cases").

- 44 -

actual knowledge of VRC's existence.  The district court called out the inconsistency and faulted Calderón for failing to reconcile -- either in his opposition to VRC's motion or his surreply -- his contradictory deposition testimony where he indicated he actually first learned about VRC in September 2017.

Only in a motion for reconsideration before the district court (after the court had pointed out the inconsistency and discarded the declaration) did Calderón switch theories and claim that, regardless of the inconsistency, his earlier deposition testimony nevertheless "yields an inescapable conclusion" that the statute of limitations against VRC "began to run no earlier than the date [Calderón] filed his Complaint on September 13, 2017." The district court denied Calderón's reconsideration motion without addressing this new assertion, relying instead on the absence of any extrajudicial claim notice that would justify pausing the clock.

On appeal, in trying to convince us that the district court got it wrong, Calderón argues that even with the declaration set aside, he should still prevail on the record remaining.  But elsewhere in his brief, he spills much ink in trying to explain to us why his declaration and deposition testimony are, in fact, reconcilable and do not create a contradiction as to when he learned of VRC's existence.  Specifically, in his briefing to us, Calderón insists he "never testified that the []phrase [']this

whole legal process' meant the date he filed the initial Complaint." But in the very next sentence, Calderón repeats that his deposition testimony was "that with the phrase 'this whole legal process' he was referring to the Complaint." Calderón then asserts (without explaining) that "correctly and objectively read, [Calderón's] deposition testimony merely states that 'this whole legal process' means this suit. More importantly, the deposition testimony does not establish the moment during this legal process in which [Calderón] learned about [VRC]." And to wrap up that argument, Calderón says the district court "erred by alluding to a contradiction that the record does not reflect."

The problem with Calderón's argument is that although he (understandably) attempts to put a spin on his deposition testimony, a fair reading simply does not allow for it. VRC's attorney pinned down what Calderón meant by "this whole process" during the deposition. VRC's attorney asked, "[t]his whole process referring as to the complaint?" and Calderón unequivocally answered "[y]es." Therefore, much like the district court, we are confronted with Calderón's arguments on appeal wherein he asks us to consider two different contradictory dates as to when he discovered VRC's involvement in his father's care. Because Calderón's September 2017 and April 25, 2018 dates cannot both be true, while in theory either could be true, he has proposed an impossibility of Aristotelian proportion. See Aristotle,

Metaphysics, Gamma 3 1005b (Lawson-Tancred trans.) (demonstrating the impossibility of believing that the same thing both is and is-not). Moreover, he does not give us a coherent argument as to which date he truly gained actual knowledge (and again, there can only be one), so, in necessary consequence, neither date can be deemed probative of Calderón's summary judgment burden of preponderating against the one-year limitation period. See Pleasantdale Condos., LLC, v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (requiring a nonmovant to "present definite, competent evidence" that is not "conjectural or problematic" in order to avoid the summary judgment axe (first quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991); and then quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989))).

Summary judgment is our procedural device "to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); see also Babrocky v. Jewel Food Co., 773 F.2d 857, 861 (7th Cir. 1985) (describing the objective of summary judgment as "to weed out unfounded claims, specious denials, and sham defenses"). Given Calderón's arguments here and the irreconcilable factual contradiction in the papers before us, we are left without any definitive, competent evidence as to when Calderón acquired actual knowledge of VRC's existence, without which, Calderón cannot meet his burden to defeat VRC's

statute of limitations defense.  Accordingly, we cannot say that the district court erred in granting summary judgment for VRC.

**(3)**

The third and final argument in Calderón's pushback against the district court's grant of summary judgment for VRC involves a facet of Puerto Rico law known as the "perfect solidarity" doctrine.  This doctrine implicates a specific type of joint and several liability under the Civil Code and it applies to multiple defendants who are closely connected through a common interest or relationship among themselves or are known to each other, and are thus, collectively, responsible for a single obligation.  Hamdallah, 91 F.4th at 26.

Ordinarily, a plaintiff seeking to toll the statute of limitations through an extrajudicial claim notice must send notice separately to each and any joint tortfeasor.  Id.  The perfect solidarity doctrine is an exception to this rule whose key consequence allows that an action that interrupts the statute of limitations for one defendant also interrupts it for all others in perfect solidarity with that defendant.  See id.  Or in common parlance, a tolling as to one is deemed a tolling as to all.

Calderón claims the district court, in its examination of his opposition to VRC's statute of limitations defense, improperly "inverted the applicable burden of proof in connection with the perfect solidarity doctrine" and therefore erred.  The

gist of Calderón's argument goes like this: The district court, after correctly finding that VRC was in perfect solidarity with other codefendants to whom he sent tolling notices, inappropriately relieved VRC of its burden to demonstrate why perfect solidarity should not have attached to these codefendants. Instead, "the [d]istrict [c]ourt faulted [Calderón] for having presented no arguments about the perfect solidarity doctrine and applied the raise-or-waive rule against him." Without getting too deep into the weeds, here's a more detailed breakdown of Calderón's argument (as best we understand it), and why he is mistaken.

First, Calderón builds his appellate argument off a shaky premise pulled from his version of what he alleges the district court said. However, Calderón misinterprets the district court's opinion and distorts what was actually said. The district court first stated that "imperfect" solidarity (the absence of "perfect" solidarity) applied to VRC because Calderón had failed to present any argument that perfect solidarity existed between VRC and any other codefendant. But, Calderón homes in on one other sentence from the court's opinion: "[t]he Court highlights that [d]efendant does not question whether [VRC] has 'perfect' solidarity with any other [d]efendant in this case; it is, therefore assumed." When taken out of context, this sentence could be read (as Calderón wishes it to be) as the district court, in fact, assuming VRC was in perfect solidarity with the others;

however, the surrounding analysis indicates that the district court did no such thing. Rather, it assumed the opposite (no solidarity) because no one, including Calderón, had argued that it applied.[20] So, Calderón's statement that "the [d]istrict [c]ourt correctly ruled that VRC Group was in perfect solidarity with other codefendants" misinterprets the record.

Next, Calderón gripes that the district court inverted the initial burden of proof by faulting him for not raising a perfect solidarity argument implicating VRC. Relying on his view of the district court's opinion (as opposed to any caselaw), Calderón suggests that VRC's perfect solidarity with other codefendants (whom he successfully tolled) was a matter to be legally assumed, placing the burden on VRC to either dispute or provide evidence that Calderón failed to toll the statute of limitations against all other perfect-solidarity codefendants.

The applicable law on who has the burden of proof here says otherwise. Once VRC raised its affirmative defense, the burden shifted to Calderón, who filed his lawsuit more than one year after his father's death, to prove the prescription period was interrupted. See Tokyo Marine, 142 F.3d at 4. He could have done this in a couple of ways. As noted earlier, one method of

---

[20] This reading is consistent with the district court's identical analysis regarding Dr. Hernández, where the court "assume[d] [perfect solidarity] d[id] not exist."

- 50 -

proving that the prescription period was interrupted would have been to present evidence of an extrajudicial claim notice sent to VRC because, in cases of imperfect solidarity, "the statute of limitations must be tolled separately for each joint tortfeasor." Hamdallah, 91 F.4th at 26 (quoting Rivera-Carrasquillo, 812 F.3d at 217 n.4). Calderón has never claimed to have done this.

Or, since the burden of proving that he interrupted the prescription period started with Calderón, he could have presented, but did not, a developed argument to the district court (or us) as to why VRC had perfect solidarity with any other codefendant whose prescription period had been properly tolled. See id. (explaining that perfect solidarity is an exception to the general rule allowing for "tolling as to one co-tortfeasor" to properly "toll the statute of limitations as to the rest" (citation modified)).[21] Because the doctrine of perfect solidarity remains an exception to one method of interrupting the prescription period which was Calderón's burden to demonstrate, the district court did not invert the burden of proof by keeping it with Calderón and we cannot conclude the district court erred.

---

[21] For context, courts have found perfect solidarity existent in certain relationships where one party is vicariously liable for the acts of another, such as the employer-employee, hospital-physician, or insurer-insured relationship. See, e.g., Hamdallah, 91 F.4th at 26 (collecting cases).

Furthermore, Calderón never presented a developed argument to the district court (or us) that VRC had perfect solidarity with any other codefendant. Therefore, he has waived his ability to do so. See Wood v. Milyard, 566 U.S. 463, 470 (2012) ("It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal." (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991))); see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").[22]

### (E)

We are left with no basis to find that Calderón lacked knowledge of his claim against VRC during the relevant period or otherwise properly tolled the statute of limitations. Accordingly, we affirm the entry of summary judgment in favor of VRC.[23]

---

[22] On a similar note, Calderón has also waived his argument requesting that we reinstate his vicarious liability claims against VRC should we vacate the dismissed claims against any of the doctors involved in this appeal. As VRC points out, Calderón raises this argument for the first time in three sentences of his opening brief -- without reference to the record or supporting caselaw. We decline the unattractive invitation to do counsel's work and put flesh on the bones of this argument. See Zannino, 895 F.2d at 17.

[23] Before wrapping up this matter, we acknowledge that Calderón has also appealed the district court's denial of his motion to reconsider the entry of summary judgment in favor of

- 52 -

Our next codefendant, Dr. Hernández, had an experience similar to VRC's at the district court. As a refresher, Dr. Hernández was the overlapping physician at Doctors' Hospital on January 24, 2016, who never interacted with or treated Calderón's father, Marrero. Dr. Hernández was added to the current lawsuit after Calderón filed his second amended complaint alleging medical malpractice under Puerto Rico's general tort statute in April 2018. Calderón's assertion of liability against Dr. Hernández is premised upon what Calderón contends was a negligent omission to medically intervene when Dr. Hernández had a duty to do so. And much like VRC, Dr. Hernández too moved for summary judgment, in part, claiming that Calderón's action against him was time-barred under Puerto Rico's statute of limitations.[24]

In opposition to this motion for summary judgment, Calderón again argued that he lacked the requisite knowledge of his claim against Dr. Hernández until April 25, 2018 -- the date

---

VRC. As we discussed, Calderón used this motion as the vehicle for proposing the September 2017 accrual date. Echoing our rationale above, the district court did not abuse its discretion in denying the motion to reconsider because Calderón presented an argument based on pre-existing evidence that he could have and should have raised prior to judgment. See Iverson v. City of Boston, 452 F.3d 94, 104 (1st Cir. 2006).

[24] "In part" because Dr. Hernández also moved for summary judgment on a causation theory as both he and Calderón agree that Dr. Hernández never treated Marrero. More about this factoid coming soon.

when Dr. Hernández's identity and involvement at Doctors' Hospital was revealed to Calderón through interrogatory answers filed in the parallel state court case. To support this actual knowledge argument, Calderón submitted an unsworn declaration identical to the one he used in opposing VRC's motion for summary judgment. And again, the district court disregarded the unsworn declaration sua sponte.

Due to the similarities just described, Calderón's appellate brief covering his claims against Dr. Hernández "incorporates by reference and reasserts all the arguments made above in the appeal against [VRC]." But, and this is a significant but, Calderón, unlike the deposition questioning relative to VRC, was never asked during his deposition when he first learned of Dr. Hernández, and the only evidence in the record of his discovery of Dr. Hernández's involvement is contained in his declaration. So, unlike the district court's three-pronged reasoning (that we previously noted) for disregarding Calderón's declaration opposing VRC's motion, the district court articulated a narrower justification for disregarding Calderón's separate declaration submitted in opposition to Dr. Hernández's motion: that Calderón "failed to provide necessary documents to comply with the standard set forth in Fed. R. Civ. P. 56(c)(4)." As the reader will soon learn, to do so, we conclude, was error and consequently an abuse of discretion.

**(A)**

Like before, we first review the district court's evidentiary ruling which defines the scope of summary judgment and do so for abuse of discretion. Bonner, 68 F.4th at 686-87. "Under that standard, we will not disturb the district court's ruling unless the record demonstrates an error of law or a serious lapse of judgment on the part of the court." Id. at 688 (quoting Livick, 524 F.3d at 28).

The district court faulted Calderón's declaration attached to his summary judgment opposition for failing to also attach a copy of the interrogatory responses from the parallel state court litigation referenced in that declaration which exposed Dr. Hernández's role in this saga.[25] In support of its decision to disregard the declaration, the court cited Federal Rules of Civil Procedure 56(c)(4). That rule reads in full: "Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the

---

[25] A copy of these interrogatory responses was soon after brought to the district court. The specific answer provided by Doctors' Hospital stated "[s]ee attached Emergency Room calendar." This calendar, which presumably included Dr. Hernández's name, was not attached to Calderón's translated copy of the interrogatory answers. However, Dr. Hernández attached a copy of an emergency room calendar (for the hospital staff in January 2016 but timestamped August 30, 2018) to his statement of uncontested material facts in support of his motion for summary judgment.

affiant or declarant is competent to testify on the matters stated." Despite the court finding this failure to attach a "procedural deficiency . . . not an issue of authentication or evidence admissibility," the language of the rule it cited (and which we've just produced for the reader) does not address what might constitute a procedural deficiency of an affidavit, but rather, pertains exclusively to the necessary substantive content of an affidavit or declaration for it to be admissible evidence. See Bonner, 68 F.4th at 687 (describing Rule 56(c)(4) as an evidentiary "scalpel, not a butcher's knife"). Thus, on its face, we see nothing to suggest, as the district court determined, a procedural requirement stemming from this rule -- much less one requiring that a document referenced in a declaration be attached lest the declaration be disregarded.[26]

In its earlier discussion on VRC's motion, the district court gave a different explanation for invoking this purported procedural requirement. Specifically, the district court looked to the 2010 Advisory Committee's interpretation of Rule 56 and determined "that any document reference [sic] in a declaration 'must be placed on the record.'" (quoting Fed. R. Civ. P. 56 (2010

---

[26] Dr. Hernández had little to say about this requirement other than "the [d]istrict [c]ourt correctly found that plaintiff's claim . . . was flawed as [p]laintiff failed to provide necessary documents to comply with the standard set forth in [Fed. R. Civ. P.] 56(c)(4)."

Advisory Committee Note)).  That quoted language comes from the Advisory Committee Note on Rule 56(c)(1)(A), which outlines general procedures for supporting factual assertions when moving for or opposing summary judgment.  But, as Calderón points out, the district court is looking to the wrong Committee Note for guidance, and had it instead referenced the Advisory Committee Note for Rule 56(c)(4), it would have seen that that Note tells a different and more relevant story.  There, the Committee states, "[t]he requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record."  Fed. R. Civ. P. 56(c)(4) (2010 Advisory Committee Note).  According to the Advisory Committee's interpretation of the rule cited by the district court, the obligation it levied on Calderón has been "omitted as unnecessary."

On top of citing Rule 56(c)(4) and the 2010 Advisory Committee notes, the district court also cited caselaw from the District of Puerto Rico.  The specific case cited by the district court for imposing this procedural duty on Calderón was decided in 2007, three years before the 2010 amendments which omitted the attach-a-document requirement.  Compare Serrano-Pagán v. Bernal Echeandia, No. 05-1429, 2007 WL 9761359, at *2 (D.P.R. 2007)

("Since the affidavit is based almost exclusively on the content of documents contained in a personnel file, Defendant was obligated to provide copies of said documents -- no such documents were ever provided.") with Int'l Shipping Agency, Inc. v. Unión de Trabajadores de Muelles Local 1740, No. 12-1996, 2015 WL 5022794, at *2 (D.P.R. Aug. 21, 2015) ("The 2010 amendments removed this language; now, the Rule makes no such affirmative requirement, placing upon the adverse party the burden to raise an objection."). Therefore, the district court's reliance on caselaw is insufficient.

Because the amended Rule 56(c)(4) does not impose the procedural burden thrust upon Calderón by the district court, it leaves the contents of Calderón's declaration in play for the purpose of opposing Dr. Hernández's motion for summary judgment. So, we turn to the relevant statement from Calderón's declaration. It reads "I first learned about the existence of . . . Dr. Carlo Hernández on April 25, 2018, through answers provided by the Hospital for an interrogatory served in parallel State Court litigation." The fact submitted here by Calderón is based on his personal knowledge (when he learned about Dr. Hernández) and could be admissible trial evidence, i.e., he could testify to this fact at trial. See Rodríguez-Severino v. UTC Aerospace Sys., 52 F.4th 448, 460 (1st Cir. 2022); see also Holiday Hospitality Franchising, LLC v. Oakbrook Realty and Invs., LLC, 817 Fed. Appx. 694, 700

(11th Cir. 2020) (citing Fed. R. Civ. P. 56(c)(4)) (explaining that a declaration based on personal knowledge need not always attach a referenced document to be acceptable evidence on summary judgment).

As for the district court's reference to the requirements of Rule 56(c)(1)(A) (which, in fairness, is the justification for the 2010 amendments' omission of the previous procedural requirement), Calderón's declaration itself is the material in the record supporting his factual assertion. See Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting . . . a fact . . . must support the assertion by: citing to particular parts of materials in the record, including . . . affidavits or declarations."). And while Calderón's statement references a document not in the record, the inclusion of that document would not have provided evidence of his factual assertion -- the point in time when he first learned about Dr. Hernández's existence. Taking this a step further, even if Calderón had included Doctors' Hospital's interrogatory responses with his opposition, the contents of that document would've shown that Dr. Hernández was working on January 24, 2016 (a fact not in dispute) but would not have proven whether Calderón became aware of this fact on April 25, 2018.

Because the district court imposed a nonexistent obligation on Calderón to provide a document that his declaration referenced but was not probative of the otherwise admissible fact

asserted, the district court erred in disregarding the declaration.

**(B)**

Finding that the district court improperly disregarded Calderón's declaration submitted in opposition to Dr. Hernández's summary judgment motion does not end our inquiry. "It remains for us to determine whether a jury, armed with the [declaration], reasonably could conclude that" Calderón's actual knowledge of Dr. Hernández's involvement proves that he lacked the requisite knowledge to initiate the prescription period sooner. See Alston v. Town of Brookline, 997 F.3d 23, 45 (1st Cir. 2021) (proceeding to review an award of summary judgment after accepting record evidence previously excluded by the district court).

To briefly rehash, under Puerto Rico law, the one-year statute of limitations clock for tort claims like this starts running "when [an] injured party has knowledge 'of the injury and of the likely identity of the tortfeasor.'" Hamdallah, 91 F.4th at 22 (quoting Tokyo Marine, 142 F.3d at 3). "[T]wo types of knowledge can trigger the ticking of the clock: actual knowledge and deemed knowledge." Id. And since Calderón brought his claim more than one year after his father died, he bears the burden of demonstrating that he "lacked the requisite knowledge at the relevant times." Rivera-Carrasquillo, 812 F.3d at 216 (citation modified).

Calderón's declaration supports his actual knowledge argument, which he refers to as "the cognitive theory of damages." Under this theory, Calderón presents April 25, 2018 (the day on which Dr. Hernández's involvement came to light in the parallel state court proceeding) as the beginning of the one-year prescription period he had for filing his claim against Dr. Hernández. In pushing this late accrual date, Calderón suggests that, despite his diligence in pursuing his rights, he did not gain enough knowledge to bring suit until the point when he gained actual knowledge. See Rivera-Carraquillo, 812 F.3d at 217. Dr. Hernández says that the appropriate accrual date is "January 25, 2016 or shortly thereafter" as this is "the date in which the sole plaintiff, an emergency room physician himself and expert in the field of emergency medicine, knew or should have known through minimum diligence, that the alleged malpractice occurred."[27] Aside from this accrual date, Dr. Hernández does not specify a point in time where Calderón should otherwise have become aware of his existence or role in Calderón's claim. Strikingly, Dr. Hernández's

_____

[27] If this sounds familiar, it should. Dr. Ávila and Dr. Torres made this argument to the district court in their motions to dismiss and, just as the district court did, we reject this formulation. See Montalvo v. González-Amparo, 587 F.3d 43, 47-48 (1st Cir. 2009). Furthermore, Dr. Hernández is even further astray than his fellow codefendants were because he states there was nothing connecting him to Marrero during Calderón's visit in January 2016. See Meléndez Colón v. Rosado Sánchez, 995 F.3d 262, 268 (1st Cir. 2021) (explaining deemed knowledge as consisting of both knowledge of "injury and the author of that injury").

factual assertions suggest the exact opposite -- that he never met Calderón or his father, and that Calderón "did not find any document that showed that his father was assigned or transferred to [Dr. Hernández] at any time during his stay at the hospital."

Taking the facts and any reasonable inferences in the light most favorable to Calderón, the evidence is not so lopsided to compel a finding that Calderón was aware of, or should have been aware of, enough facts to constitute deemed knowledge of Dr. Hernández's involvement such that we could conclude that Calderón's claims are time-barred as a matter of law. See Hamdallah, 91 F.4th at 22 (quoting Rodríguez-Surís, 123 F.3d at 14). Specifically, the parties' factual assertions demonstrate that none of the medical records provided from Doctors' Hospital had Dr. Hernández's name on them; he was never consulted about any treatment for Marrero; he never provided any treatment to Marrero; and overall, Dr. Hernández had nothing to do with Marrero while he was at Doctors' Hospital. The undisputed fact that Dr. Hernández's identity was omitted from the relevant hospital records, and that he never interacted with Calderón or his father, supports Calderón's actual knowledge argument that he only learned about Dr. Hernández through discovery in the state court proceeding. See Espada v. Lugo, 312 F.3d 1, 4 (1st Cir. 2002); Rodriguez-Suris v. Montesinos, 123 F.3d 10, 13-14 (1st Cir. 1997); see also Velazquez v. Schindler Corp. of P.R., 968 F. Supp. 2d 475, 478

(D.P.R. 2013) (finding a claim not time-barred where a plaintiff learned the identity of her tortfeasor through the discovery process).

Furthermore, Dr. Hernández has not provided a date or point in time where Calderón (or an otherwise reasonable actor in Calderón's shoes) should have identified Dr. Hernández as the author of his injury. Cf. Hamdallah, 91 F.4th at 23-24 (discussing dates and events sufficient to constitute deemed knowledge); Meléndez Colón v. Rosado Sánchez, 995 F.3d 262, 268 (1st Cir. 2021) (same). Therefore, at this juncture, whether Calderón's late procurement of actual knowledge was a result of his lack of due diligence is a question better left for a jury, where, as here, "the outcome is within the range where reasonable men and women can differ." Hamdallah, 91 F.4th at 22 (quoting Villarini-Garcia v. Hosp. del Maestro, 8 F.3d 81, 86-87 (1st Cir. 1993)); see also Velazquez, 968 F. Supp. 2d at 479 (noting that "[p]laintiff need not take all possible steps to ascertain the identity of [her tortfeasor]" but rather "act as a reasonable person in her position to determine the identity of the tortfeasor").

For the reasons just discussed, we vacate the district court's grant of summary judgment in favor of Dr. Hernández and remand for further proceedings.[28]

---

[28] Dr. Hernández urges us to consider an alternate basis for affirming the entry of summary judgment in his favor -- namely

The final chapter of this appeal involves Dr. Rivera who, as we noted earlier, was another licensed physician and the acting medical director of Doctors' Hospital Emergency Room when Calderón's father was a patient. Additionally, Dr. Rivera is the sole owner and director of fellow appellee VRC. Here's the scoop on what's happened between Dr. Rivera and Calderón up to this point.

**(A)**

Calderón's second amended complaint stated four causes of action against Dr. Rivera. Calderón's appellate arguments relate to the first two, which the district court referred to as the "medical malpractice claim," and the "commercial liability claim." Calderón voluntarily withdrew his remaining causes of action (a point we will return to soon) so, in theory (we say in theory because Calderón nonetheless gives us detailed briefing on one of his withdrawn causes of action) they should no longer be an issue here. The medical malpractice claim relates to Dr. Rivera's

---

that the record evidence precludes a finding that his conduct contributed to Calderón's father's death. The district court, having only reached the statute of limitations issue, did not weigh in on this casual argument nor did it consider Calderón's opposition supported by deposition testimony (explaining the duty Dr. Hernández owed) and an expert report (opining on why the breach of that duty harmed Calderón's father). And we decline to do so in the first instance. Cf. Douglas v. York County, 360 F.3d 286, 291 (1st Cir. 2004).

actions taken as medical director of Doctors' Hospital Emergency Room, while the commercial liability claim concerns Dr. Rivera's role as owner and director of VRC. Both of these claims were pled under Puerto Rico's general tort statute which we will discuss in full shortly.

Like some of the appellees we've already discussed, Dr. Rivera moved for summary judgment before the district court in both his capacity as medical director of Doctors' Hospital Emergency Room and director of VRC. That motion made two arguments we've seen before: (1) summary judgment was warranted because Dr. Rivera never provided any direct medical treatment to Calderón's father; and (2) Calderón's claims against Dr. Rivera were time-barred. Calderón opposed the motion, in relevant part, by arguing that Dr. Rivera negligently failed to fulfill his duties as medical director of the emergency room and director of VRC. Furthermore, Calderón argued that his claim against Dr. Rivera in his capacity as medical director was not time-barred because he sent Dr. Rivera an extrajudicial claim notice before the statute of limitations had run (he attached this extrajudicial claim notice to his opposition for the court's consideration).

The district court started with the statute of limitations defense, swiftly finding the claim against Dr. Rivera as director of VRC time-barred because the claim against VRC was time-barred (for the reasons we detailed earlier). But the

district court rejected Dr. Rivera's statute of limitations defense for Calderón's claim against him as the medical director of the emergency room. In this instance, the district court found that Calderón properly sent an extrajudicial claim notice to Dr. Rivera on February 13, 2017, thereby tolling the statute of limitations.[29]

After announcing this fleeting victory for Calderón, the district court proceeded to scrutinize the merits of Calderón's responses to the arguments made by Dr. Rivera in his summary judgment motion. However, needing more information, the district court issued a show cause order to the parties requesting further briefing and specific caselaw related to certain legal questions the court was pondering. In short, those questions sought an answer to whether Dr. Rivera could be held liable for "negligence in the performance of supervisory duties" and "directors' liability" under the Puerto Rico general tort statutes, P.R. Laws Ann. tit. 31 §§ 5141-5142. Despite having seemingly already found the claims against Dr. Rivera in his corporate capacity time-barred, an additional question posed to the parties also

---

[29] In a reply to Calderón's opposition, Dr. Rivera submitted an unsworn declaration stating that he never received Calderón's extrajudicial claim letter. The district court disregarded this statement because it came as an attachment to Dr. Rivera's reply and Dr. Rivera did not address this issue in his initial motion. We'll briefly touch on this issue later, but ultimately its exclusion remains immaterial to our analysis.

sought an answer to whether "a physician, not a hospital <u>nor a</u> <u>corporation</u> contracted by it, has ever been held liable under" Calderón's legal theory (our emphasis). In its show cause order, the court also advised the parties that it was considering certification to the Puerto Rico Supreme Court to decide these legal questions.

After reviewing the supplemental submissions, the district court entered summary judgment in favor of Dr. Rivera. The relevant opinion and order held "as a matter of law, these 'duties, obligations and omissions' advanced by [p]laintiff are not predicated on *direct* medical treatment or intervention of a patient and are unconceivable and unsupported by [P.R. Laws Ann. tit. 31, § 5141], and the applicable Commonwealth case-laws."

## (B)

Having set forth the basics on how Calderón and Dr. Rivera got here, let's break down what we're being asked to decide. Calderón's appeal against Dr. Rivera consists of three arguments: (1) the district court erred as a matter of law in holding the Puerto Rico tort statute only applies to physicians who provide direct treatment to a patient; (2) in making a purely legal determination, the district court, in consequence, ignored record evidence which made summary judgment inappropriate; and (3) the district court incorrectly dismissed Calderón's claim against Dr. Rivera as owner and director of VRC after finding Calderón's

separate claims against VRC were time-barred. For his part, Dr. Rivera: (1) reminds us that he never intervened with Marrero; (2) simply states that the district court correctly applied the Puerto Rico general tort statute for medical malpractice claims; and (3) argues that Calderón has based his corporate liability argument on a statute inapplicable to the cause of action raised in his complaint.[30]  So says Dr. Rivera, we should affirm the district court's ruling.

With the background and current field of play established, we continue with our review of the district court's grant of summary judgment in favor of Dr. Rivera and do so de novo. See Hamdallah, 91 F.4th at 16.

**(C)**

The first question to decide is relatively straightforward compared to others we've encountered throughout this appeal:  Can the Puerto Rico general tort statute, P.R. Laws

---

[30] Dr. Rivera also asks us to affirm on the alternate ground that Calderón did not interrupt the prescription period because he failed to prove that Dr. Rivera actually received the extrajudicial claim notice. Due to the favorable judgment below, Dr. Rivera may raise this challenge without filing a cross-appeal. See Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc., 121 F.4th 228, 244 (1st Cir. 2024). As the district court determined when rejecting this argument at summary judgment, the fact that Calderón's extrajudicial claim notice was stamped "received" by Doctors' Hospital satisfies Calderón's burden at the summary judgment stage. See Kery v. Am. Airlines, Inc., 931 F. Supp. 947, 955 (D.P.R. 1995) (finding a certified-mail-return receipt sufficient evidence for a reasonable fact finder to resolve summary judgment in the nonmovant's favor).

Ann. tit. 31, § 5141, impose liability on a physician who did not provide direct medical treatment or otherwise intervene with a patient? The district court determined this answer to be no, therefore necessarily precluding relief for Calderón's claim that Dr. Rivera, as the emergency room director, had a duty to supervise, monitor, and correct the subpar performance of other ER physicians or, alternatively, had an obligation to step in and provide medical care himself when others failed to do so. After a careful review of Puerto Rico law (specifically the cases cited by the district court and provided by the parties), we disagree with the district court's perspective and answer this legal question in the affirmative. Here's why.

The Puerto Rico general tort statute provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. Under this statute, "to prevail on a medical malpractice claim, 'a party must establish (1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient casual nexus between the breach and the harm.'" Pagés-Ramírez v. Ramírez-González, 605 F.3d 109, 113 (1st Cir. 2010) (quoting Marcano Rivera v. Turbado Med. Ctr., 415 F.3d 162, 167 (1st Cir. 2005)). Where, as here, we are dealing with an alleged omission, "[a]n omission gives rise to a cause of action only in cases where there is a legal duty to act." De-Jesus-Adorno

- 69 -

v. Browning Ferris Indus. of P.R., Inc., 160 F.3d 839, 842 (1st Cir. 1998) (applying Puerto Rico law). And furthermore, "[i]n the context of medical malpractice actions, the Puerto Rico Supreme Court has explained that a physician's duty is 'to offer his or her patient that medical care, attention, skill, and protection that, in the light of the modern means of communication and education, and pursuant to the current status of scientific knowledge and medical practice, meets the professional requirements generally acknowledged by the medical profession." Pagés-Ramírez, 605 F.3d at 113 (quoting Santiago Otero v. Méndez, 135 D.P.R. 540, 549 (1994)); see generally De-Jesus-Adorno, 160 F.3d at 842 ("Under Puerto Rico law, a legal duty arises in one of three ways: (1) by a statute, regulation, ordinance, bylaw or contract; (2) as the result of a special relationship between the parties that has arisen through custom; or (3) as the result of a traditionally recognized duty of care particular to the situation.").

If a physician has a legal duty to offer his or her patient medical care, attention, and protection, then the negligent omission of that duty owed falls within the scope of Puerto Rico's general tort statute. See Rolon-Alvarado v. Mun. of San Juan, 1 F.3d 74, 79 (1st Cir. 1993) (citing Thomas v. Corso, 288 A.2d 379, 388 (Md. 1972), for the proposition that a "physician's outright failure to attend a patient" could be such

a clear case that expert testimony is not necessary to prove a defendant's negligence). Therefore, the district court legally erred in finding that duties, obligations, and omissions "not predicated on *direct* medical treatment or intervention of a patient" "are inconceivable and unsupported by [P.R. Laws Ann. tit. 31, § 5141]." The failure of a medical director to perform a legal duty -- such as intervening in the medical treatment of a patient or ensuring that reasonable treatment is otherwise provided -- could fall within the protections of Puerto Rico's general tort statute.

In light of this limited legal error, we stop short of scouring the record and reviewing the expert testimony to decide in the first instance whether Calderón has provided sufficient evidence to establish that Dr. Rivera indeed had a legal duty which he negligently failed to carry out in regard to Calderón's father. We have only reopened a path previously barricaded by the legal conclusion of the district court in this matter. It remains Calderón's burden to refute, by show of evidence, the presumption that Dr. Rivera has reasonably fulfilled his duties and obligations. See Rolon-Alvarado, 1 F.3d at 78. Therefore, our review ends at vacating the district court's order, and we remand

for proceedings consistent with this opinion.  Cf. Douglas, 360 F.3d at 291.[31]

## (D)

All that's left in this appeal is Calderón's remaining appellate argument against Dr. Rivera for his actions taken as director of VRC.  According to Calderón, the district court erred in dismissing this director liability claim as time-barred because he had specifically sought relief not only from VRC as a corporate entity, but also from Dr. Rivera for his personal "negligent actions and omissions" taken as VRC's corporate agent, which were separate and distinct claims.  Thus, the argument goes, a time-barred holding in favor of VRC should not have been dispositive for this representative claim against Dr. Rivera as VRC's director.  We find this claim not viable as Calderón asks us to resuscitate a cause of action against Dr. Rivera that he, as we earlier noted, voluntarily desisted.

After taking a long look at Calderón's submissions -- that is everything from his amended complaint to his appellate brief -- it is apparent from our review that this claim against Dr. Rivera in his capacity as the director of VRC was voluntarily dismissed.  The bygone discarded cause of action,

---

[31] For similar reasons and as a result of this resolution, we need not decide Calderón's second appellate argument pertaining to the record evidence.

titled "Director's Liability Under Article 1802," alleged that "as [VRC's] owner, President and Director, Dr. Rivera failed to make sure that employees at [VRC] comply with the required rules, procedures, policies and protocols" among other similar claims. When the district court reviewed Dr. Rivera's summary judgment motion related to this claim, it asked the parties to show cause as to whether a physician had ever been held liable under Puerto Rico's general tort statute for what Calderón referred to as "director's liability." But rather than putting forward caselaw and "showing cause," Calderón sought to "eliminate the possibility of significant [litigation] delay in the form of a certification to the Puerto Rico Supreme Court" and "voluntarily desist[ed] of his causes of action against Dr. [Rivera] for negligent supervision and directorial negligence."[32]

Calderón's appellate asseveration now seeks to circumvent the district court's prudent contemplation of certifying these questions to the Puerto Rico Supreme Court for guidance. In pressing his claims anew, Calderón argues that Dr. Rivera is "directly liable for the negligent damages personally caused as well as for those caused by the professionals who negligently provide services on the corporate behalf." However, as Dr. Rivera points out on appeal, nowhere in his remaining causes

---

[32] Contrary to his description on appeal, Calderón voluntarily desisted both his third and fourth causes of action.

of action against Dr. Rivera are such claims pleaded.  And under his second cause of action (where Calderón now attempts to hang this argument), only Doctors' Hospital and VRC are alleged to have provided privileges to or contracted with unfit physicians, including Dr. Rivera.  More to this point, the second cause of action never alleges that Dr. Rivera acted in his capacity as the director of VRC.

The summary judgment stage is not a "procedural second chance to flesh out inadequate pleadings," and neither is an appeal.  See Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 85 (1st Cir. 2008) (quoting Fleming v. Lind-Waldock & Co., 922 F.2d 20, 24 (1st Cir. 1990)).  Calderón made the overtly tactical decision to withdraw his "director's liability" cause of action and accordingly, we reject Calderón's attempt to circumvent the law of the case which he helped establish below.  Cf. In re Nexium Antitrust Litig., 778 F.3d 1, 2 (1st Cir. 2015) (citing Albers v. Eli Lilly & Co., 354 F.3d 644, 646 (7th Cir. 2004) (per curiam)).  Because the arguments presented by Calderón in this portion of his appeal no longer have a suitable cause of action, we affirm the district court's decision in finding this claim no longer viable.

**CONCLUSION**

Based on the foregoing, the district court's entries of summary judgment in favor of Dr. Ávila, Dr. Torres, Dr. Hernández, and Dr. Rivera as to Calderón's first cause of action are **vacated**

and **remanded** for further proceedings consistent with this opinion. The awards of summary judgment in favor of VRC and Dr. Rivera as to Calderón's second cause of action are **affirmed**.  The parties shall bear their own costs.